# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-50070

United States Court of Appeals
Fifth Circuit

**FILED**

March 1, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MARIA ISABEL MOLINA-ISIDORO,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before DAVIS, HAYNES, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:*

After discovering kilos of meth in the suitcase Maria Isabel Molina-Isidoro was carrying across the border, customs agents looked at a couple of apps on her cell phone. Molina argues that the evidence found during this warrantless search of her phone should be suppressed. Along with amici, she invites the court to announce general rules concerning the application of the government's historically broad border-search authority to modern technology for which the Supreme Court has recognized increased privacy interests. *See Riley v. California*, 134 S. Ct. 2473, 2489–91, 2493 (2014). We decline the invitation to do so because the nonforensic search of Molina's cell phone at the

---

* Judge Haynes concurs in the judgment only.

border was supported by probable cause. That means at a minimum the agents had a good-faith basis for believing the search did not run afoul of the Fourth Amendment.

## I.

Molina attempted to enter the United States at a border crossing in El Paso. Customs and Border Protection officers "detected anomalies" while x-raying her suitcase. When they questioned Molina, she acknowledged owning the suitcase but claimed that it only contained clothing.

At a secondary inspection area, in response to questions about her travels, Molina said she had delivered clothing to her brother in Juarez, Mexico and would be flying home to Tijuana, Mexico from El Paso. At that point, an officer opened Molina's suitcase and noticed a modification. After rescanning the suitcase, the officers located an "anomaly . . . covered by electrical tape." That anomaly was a hidden compartment, which held 4.32 kilograms of a white crystal substance. A drug-sniffing dog alerted officers to the presence of narcotics, and the crystal substance field-tested positive for methamphetamine. Later laboratory tests confirmed that result.

Agents from the Department of Homeland Security soon arrived on the scene. Molina could not explain how the drugs made their way into her suitcase, though she admitted that no one could have placed them there without her knowledge. Then Molina again recounted her recent travels. She claimed to have taken a taxi from El Paso to Juarez to visit her brother. But she could not remember his address. She reiterated that she was returning to El Paso to fly home to Tijuana. But she had not yet purchased a ticket. When the agents confronted Molina about why she was carrying so much personal clothing for such a short trip, she remained silent. And when the agents told Molina that her story made little sense, she ended the interview and requested

No. 17-50070

a lawyer.

Either at that point, or during the questioning, agents searched Molina's phone, looking at Uber and WhatsApp.[1]  They did not ask for, and Molina did not provide, consent for that search.   The agents found the following (paraphrased) conversation on Molina's WhatsApp:

> Molina advised RAUL that she was headed to El Paso, and requested [that] RAUL . . . send her the information for the Uber. MOLINA advise[d] RAUL that she had arrived in El Paso.  RAUL responded that he sent her the information for the Uber.  RAUL sent a picture [o]f a credit card, front and back, and told MOLINA to use that credit card information to pay for [the] Uber.  RAUL sent information regarding a hotel located in Juarez, Mexico. RAUL directed MOLINA to Hotel Suites in Colonia Playas, Room #10, and advised MOLINA that the stuff [was] located there. MOLINA advised RAUL that she [had] arrived [at] the room but no one was there.  RAUL stated he w[ould] get a hold of them. MOLINA then responded that the guy [had been] asleep [but had now] opened the door.  RAUL sent another picture of a Southwest Airlines flight itinerary.  The itinerary listed MOLINA as the passenger o[n] a flight departing El Paso at 5:15 P.M. with a final destination of Ft. Lauderdale, Florida.  MOLINA advised RAUL that she got the stuff and was headed back to El Paso.

After the search, the government kept Molina's phone but did not conduct a more intrusive forensic search of it.

A grand jury charged Molina with one count of importing methamphetamine and one count of possessing methamphetamine with the intent to distribute.  She moved to suppress the evidence obtained during the cell phone search.  The district court denied the motion to suppress, concluding that *Riley v. California* did not extend to the border-search context.  It also observed that the most demanding requirement a court has required for any type of border search is reasonable suspicion, which existed for the search of

---

[1] WhatsApp is an internet-based messaging service that permits users to exchange messages, make phone calls, and send images and videos.

No. 17-50070

Molina's phone.

The district court then held a stipulated bench trial as Molina wanted to preserve her right to appeal the denial of the suppression motion. Molina was found guilty on both counts and sentenced to five years in prison.

## II.

We do not decide the Fourth Amendment question. The fruits of a search need not be suppressed if the agents acted with the objectively reasonable belief that their actions did not violate the Fourth Amendment. *United States v. Curtis*, 635 F.3d 704, 713 (5th Cir. 2011) (citing *United States v. Leon*, 468 U.S. 897, 918 (1984)). This is the so-called "good faith" exception to the exclusionary rule. *See Leon*, 468 U.S. at 924–25 (making clear that courts may apply the good-faith exception without deciding the underlying constitutional issue). Even when the search is held unconstitutional, suppressing evidence is not appropriate if the officers acted reasonably in light of the law existing at the time of the search. *Curtis*, 635 F.3d at 713–14. In such circumstances, the cost of suppression—excluding the evidence from the truth-finding process—outweighs the deterrent effect suppression may have on police misconduct. *See Davis v. United States*, 564 U.S. 229, 237–38 (2011).

The agents searching Molina's phone reasonably relied on the longstanding and expansive authority of the government to search persons and their effects at the border. The border-search doctrine has roots going back to our founding era. *See United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) (noting the Executive's longstanding authority to conduct border searches without probable cause or a warrant). The location of a search at the border affects both sides of the reasonableness calculus that governs the Fourth Amendment. *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). The government's interest is at its "zenith" because of its need to prevent the entry of contraband, *Flores-Montano*, 541 U.S. at 152, and an

4

No. 17-50070

individual's privacy expectations are lessened by the tradition of inspection procedures at the border, *Montoya de Hernandez*, 473 U.S. at 537–38.

The Supreme Court has thus allowed warrantless searches of mail and gas tanks entering the United States. *United States v. Ramsey*, 431 U.S. 606, 624–25 (1977) (mail); *Flores-Montano*, 541 U.S. at 155–56 (gas tanks). It permitted even the 16-hour warrantless detention of a woman at the border whom customs officials reasonably suspected to be smuggling narcotics in her alimentary canal. *Montoya de Hernandez*, 473 U.S. at 535, 541, 544. We have held that officials at the border may cut open the lining of suitcases without any suspicion, *United States v. Chaplinski*, 579 F.2d 373, 374 (5th Cir. 1978), and that with reasonable suspicion they may strip search suspected drug smugglers and drill into the body of a trailer, *United States v. Afanador*, 567 F.2d 1325, 1329 (5th Cir. 1978) (strip search); *United States v. Rivas*, 157 F.3d 364, 367 (5th Cir. 1998) (drilling into trailer). These cases establish that routine border searches may be conducted without any suspicion. *See id.* at 367. So-called "nonroutine" searches need only reasonable suspicion, not the higher threshold of probable cause. *Id.*; *United States v. Kelly*, 302 F.3d 291, 294 (5th Cir. 2002); *United States v. Saboonchi*, 48 F. Supp. 3d 815, 819 (D. Md. 2014) ("Defendant has not cited to a single case holding that anything more than reasonable suspicion was required to perform a search of even the most invasive kind at the international border, and I have found none."); *see also* Wayne LeFave, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 10.5(a) n.11, 22. For border searches both routine and not, no case has required a warrant. It is this border-search precedent that allowed the scanning and searching of Molina's suitcase during which the meth was located, a search she rightly does not even challenge.

As to the examination of her cell phone that she does contest, the agents reasonably relied on this broad border-search authority. In terms of the level

5

No. 17-50070

of suspicion, they had probable cause to support the search, which is the highest standard the Fourth Amendment requires even for searches occurring in the interior. *See Illinois v. Gates*, 462 U.S. 213, 246 (1983) (recognizing that even the search of a home, which enjoys the greatest Fourth Amendment protection, requires only probable cause to support a warrant). Customs officials found a white crystal substance in a hidden compartment of Molina's luggage that field-tested positive for methamphetamine. Molina admitted that no one could have placed the meth in that compartment without her knowledge, though she gave no explanation for how it got there. She also could not remember her brother's address even though she had supposedly just been there, had no plane ticket to Tijuana, and provided no explanation for why she had so much personal clothing for such a short trip. This evidence made it highly likely Molina was engaged in drug trafficking and created a fair probability that the phone contained communications with the brother she supposedly visited (or whoever was the actual source of the drugs) and other information about her travel to refute the nonsensical story she had provided. Indeed, the incriminating evidence obtained against Molina even before the phone search was so strong that we doubt the information from WhatsApp was needed to convict her. But the government used that evidence during the bench trial and does not urge harmless error.

The existence of probable cause means the only way Molina can show the search was unlawful is if a warrant was required. But as we have already explained, no court has ever required a warrant to support searches, even nonroutine ones, that occur at the border. Although our court had not addressed border searches of an electronic device at the time of this search, a number of circuits had and none had required a warrant. *See, e.g., United States v. Stewart*, 729 F3d. 517, 525–26 (6th Cir. 2013); *United States v. Cotterman*, 709 F.3d 952, 962 (9th Cir. 2013) (en banc); *United States v. Ickes*,

393 F.3d 501, 504 (4th Cir. 2005); *United States v. Linarez-Delgado*, 259 F. App'x 506, 508 (3d Cir. 2007).

Molina argues that *Riley* changes all that.  Although most circuits to decide the issue had applied the search-incident-to-arrest doctrine to cell phones, the Supreme Court took a different view.  134 S. Ct. at 2493.  In doing so, it relied on the heightened privacy interest in smart phones given their immense storage capacity and the inapplicability of the traditional search-incident-to-arrest rationale to these searches.  *Id.* at 2488–89.  But *Riley* left open the possibility that "other case-specific exceptions may still justify a warrantless search of a particular phone."  *Id.* at 2494.

That caveat means it was reasonable for the agents to continue to rely on the robust body of pre-*Riley* caselaw that allowed warrantless border searches of computers and cell phones.  What is more, not a single court addressing border searches of computers since *Riley* has read it to require a warrant.  *See, e.g.*, *United States v. Escarcega*, 685 F. App'x 354, 354 (5th Cir. 2017); *United States v. Gonzalez*, 658 F. App'x 867, 870 (9th Cir. 2016); *United States v. Kolsuz*, 185 F. Supp. 3d 843, 852 (E.D. Va. 2016); *United States v. Caballero*, 178 F. Supp. 3d 1008, 1018 (S.D. Cal. 2016); *United States v. Feiten*, 2016 WL 894452, at *6 (E.D. Mich. Mar. 9, 2016); *United States v. Blue*, 2015 WL 1519159, at *2 (N.D. Ga. Apr. 1, 2015).  Although what ultimately matters is the reasonableness of the officers' actions at the time of the search, it is telling that no post-*Riley* decision issued either before or after this search has required a warrant for a border search of an electronic device.  Also noteworthy is that the leading Fourth Amendment treatise continues to include searches of "a laptop or other personal electronic storage devices," among the types of border searches that may be made "without first obtaining a search warrant and without establishing probable cause." LeFave, *supra*, § 10.5(a) (quoting *United States v. Arnold,* 533 F.3d 1003, 1008 (9th Cir. 2008)).  LeFave

recognizes that "*Riley* may prompt a reassessment" of border searches of computers but "doubt[s] that *Riley* will be deemed to foreclose *all* warrantless computer searches at the border." *Id.* n.22. If federal judges and a leading Fourth Amendment scholar do not believe *Riley* overrides the caselaw allowing warrantless border searches of cell phones (especially nonforensic ones), it is reasonable for government agents to take the same view until something changes.[2]

The bottom line is that only two of the many federal cases addressing border searches of electronic devices have ever required any level of suspicion. They both required only reasonable suspicion and that was for the more intrusive forensic search. *See Cotterman*, 709 F.3d at 962; *United States v. Saboonchi*, 990 F. Supp. 2d 536, 569–70 (D. Md. 2014).[3] Here we have a manual, sometimes called "cursory" in the caselaw, search of a phone. And neither *Cotterman* nor *Saboonchi* required a warrant even for forensic searches occurring at the border. The latter concluded that "the border search exception [was] unaffected by *Riley*" when a motion for reconsideration relied on that

---

[2] In addition to arguing that the reasoning of *Riley* should result in a warrant requirement for border searches of cell phones, Molina argues that a warrant was required because after the discovery of the meth the incident transformed from a border encounter into a law enforcement investigation. But she cites no case making this distinction and there is caselaw rejecting it. *See, e.g., Ickes,* 393 F.3d at 507 (holding that the postarrest search of laptop was a border search); *Kolsuz,* 185 F. Supp. 3d at 851 (same post-*Riley*); *Caballero,* 178 F. Supp. 3d at 1016–17 (recognizing some logic to this argument but rejecting it under existing caselaw). Judged again from the standpoint of the good-faith exception, it was reasonable for the agents to believe their border-search authority extended past the discovery of the meth, especially given how little time elapsed between that discovery and the phone search.

[3] A third case, *United States v. Kim*, found the search of a laptop computer using forensic software for the purpose of gathering evidence in a preexisting investigation supported by "so little suspicion of ongoing or imminent criminal activity" and so disconnected from the considerations underpinning the government's border-search authority and "also the border itself" that it was unreasonable. 103 F. Supp. 3d 32, 59 (D.D.C. 2015). As to that final point, the computer in *Kim* was seized as the defendant was leaving the country and the forensic search of the computer was conducted later after the computer was sent to a forensic specialist. So it is not like the typical border-search case.

No. 17-50070

recent Supreme Court decision. *Saboonchi*, 48 F. Supp. 3d at 817. Given the state of the law when agents looked at the apps on Molina's phone, it was eminently reasonable for them to think that the probable cause they had to believe it contained evidence of drug crimes made the search a lawful one.

\* \* \*

Because the officers acted in good faith in searching the phone, the judgement of the district court is AFFIRMED.

No. 17-50070

GREGG COSTA, Circuit Judge, specially concurring:

Courts should resist the temptation to frequently rest their Fourth Amendment decisions on the safe haven of the good-faith exception, lest the courts fail to give law enforcement and the public the guidance needed to regulate their frequent interactions. *Davis v. United States*, 564 U.S. 229, 245–46 (2011) (recognizing concerns that overreliance on the good-faith exception risks "stunt[ing] the development of Fourth Amendment law"); *cf. Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (giving courts discretion to grant qualified immunity based only on the "clearly established" inquiry but noting that deciding the underlying constitutional question is "often beneficial"). But reliance on good faith is particularly appropriate for the question this case raises about the application of the border-search doctrine to the modern cell phones that a large number of the hundreds of millions of people entering the United States each year carry with them.[1] For one thing, the existence of good faith is not a close call. *Cf. Pearson*, 555 U.S. at 239 (recognizing in the analogous two-step qualified immunity context that avoiding the constitutional question will often be appropriate when the "clearly established" question can be "quickly and easily decide[d]"). As the majority opinion explains, the government had probable cause for the manual search of Molina's phone. Maj. Op. at 6. The lesser threshold of reasonable suspicion is the highest showing any court of appeals has required for a border search of an electronic device, and that was for a more intrusive forensic search. *See United States v. Cotterman*, 709 F.3d 952, 962 (9th Cir. 2013) (en banc). And no reported federal decision has required a warrant for any border search.

---

[1] U.S. Dep't of Homeland Sec., CIVIL RIGHTS/CIVIL LIBERTIES IMPACT ASSESSMENT: BORDER SEARCHES OF ELECTRONIC DEVICES 1 (2011), https://www.dhs.gov/sites/default/files/publications/Redacted%20Report.pdf (noting that in 2010 an average of nearly 30 million travelers entered the United States each month).

No. 17-50070

Against this lack of support for Molina's position are numerous cases allowing warrantless, often suspicionless, searches of digital devices at the border. *See* Maj. Op. at 7–9.

Also counseling against deciding the constitutional issue is the risk of announcing general principles that would fix precedent in a rapidly changing area. The Supreme Court is currently considering yet another case that addresses how to apply longstanding principles of the Fourth Amendment—this time the "third-party doctrine"—to new communications technology. *United States v. Carpenter*, 819 F.3d 880, 884, 886 (6th Cir. 2016) (evaluating whether the collection of cell-site data from wireless carriers violates the Fourth Amendment), *cert. granted*, 137 S. Ct. 2211 (2017). Government policies on border searches are also changing; the same day this case was argued the Department of Homeland Security issued a new policy regulating border searches of computers and cell phones. U.S. Customs & Border Protection, CBP Directive No. 3340-049A, Border Search of Electronic Devices (2018), https://www.cbp.gov/sites/default/files/assets/documents/2018-Jan/CBP-Directive-3340-049A-Border-Search-of-Electronic-Media-Compliant.pdf.[2] And, of course, the capabilities of technology are constantly evolving.

Some or all of these developments may influence the ultimate determination of how the government's venerable border-search authority applies to electronic devices. Although the good-faith exception presents an easy question in light of existing caselaw, deciding the standard that applies

---

[2] Under the new policy, customs officers are permitted to conduct "basic" searches of digital devices at the border without suspicion. CBP Directive No. 3340-049A, *supra*, at 4. A basic search includes the examination of information kept on the device itself that is accessible without a wired or wireless connection. *Id.* at 4–5. By contrast, a customs officer can conduct an "advanced" search, in which external equipment is connected to the device, to review, copy, or analyze the contents of that device only with reasonable suspicion of activity that violates the customs laws or poses a threat to national security. *Id.* at 5.

to border searches of digital devices is not so clear cut.  In declining to apply to cell phones the search-incident-to-arrest exception to the warrant requirement, *Riley v. California* focused on the inapplicability of that doctrine's rationales—the protection of police officers and preventing the destruction of evidence—to phone searches at the scene of an arrest.  134 S. Ct. 2473, 2485–87 (2014).  It also emphasized the immense storage capacity of modern cell phones.  *Id.* at 2489.  Molina also highlights that capacity in arguing that cell phones should be treated differently from other objects at the border.

But if the expansiveness of cell phones' memory is what has led the Supreme Court to provide these devices increased protection in some Fourth Amendment areas, the best argument for carving them out of the government's traditional border-search authority is the physical limitations of their capacity.  Most contraband, the drugs in this case being an example, cannot be stored within the data of a cell phone.[3]  Detection of such contraband is the strongest historic rationale for the border-search exception. *United States v. Montoya de Hernandez,* 473 U.S. 531, 537 (1985) ("Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country."); *United States v. Ramsey*, 431 U.S. 606, 619 (1977) ("Historically such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry." (quoting *United States v. 12 200-Ft. Reels of Film*, 413 U.S. 123, 125 (1973))); *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376 (1971) (explaining that customs

---

[3] One type of contraband that can be stored within the data of a cell phone or computer is child pornography.  *See, e.g.*, *United States v. Cotterman*, 709 F.3d 952, 958–59 (9th Cir. 2013) (en banc) (noting that agents discovered child pornography during the search of a laptop seized at the border).

officials' authority to search luggage is "an old practice and is intimately associated with excluding illegal articles from the country"). The First Congress authorized customs officials to search for and seize "goods, wares, and merchandises" that may be concealed in ships entering the country to avoid duties; it did not provide that authority to obtain evidence of crimes other than the contraband itself. Act of July 31, 1789, 1 Stat. 29. The Supreme Court has long cited that statute, passed by the same Congress that proposed the Fourth Amendment, as a reason why warrantless border searches are not "unreasonable" within the meaning of the Constitution. *Boyd v. United States*, 116 U.S. 616, 623–24 (1886); *see also Ramsey*, 431 U.S. at 617; *Carroll v. United States*, 267 U.S. 132, 150–51 (1925).[4] The modern version of this customs law is also limited to the search and seizure of actual objects that are being imported unlawfully. *See* 19 U.S.C. § 482(a). And every border-search case the Supreme Court has decided involved searches to locate items being smuggled into the country, whether those objects were hidden in mail, *Ramsey*, 431 U.S. at 624–25, a gas tank, *United States v. Flores-Montano*, 541 U.S. 149, 155–56 (2004), or a stomach, *Montoya de Hernandez*, 473 U.S. at 544.

As the district court recognized, this detection-of-contraband justification would not seem to apply to an electronic search of a cell phone or computer.[5] But other considerations may still support giving government agents more leeway in searching technology at the border as opposed to inside the country. One is that the "expectation of privacy [is] less at the border than

---

[4] Also notable is that the statute, though cited as part of the pedigree supporting suspicionless border searches, only gives collectors the power to enter ships "in which they *shall have reason to suspect* any goods, wares or merchandise subject to duty shall be concealed." Act of July 31, 1789, 1 Stat. 43 (emphasis added).

[5] To the extent that drugs or other contraband can be hidden physically in a phone or computer, a physical search or x-ray of the device is seemingly no different from the search of any other object, such as luggage. But that would not involve access to the "broad array of private information" that a manual or forensic search of the phone's data would reveal, which is what heightens the privacy interest for electronic devices. *Riley*, 134 S. Ct. at 2491.

in the interior." *Montoya de Hernandez*, 473 U.S. at 539–40 (citing *Carroll*, 267 U.S. at 154). Yet even if that reduced privacy interest might support lowering the thresholds ordinarily required for searches, it is doubtful that side of the equation on its own would support searches at the border that require neither a warrant nor suspicion. *Cf. Riley*, 134 S. Ct. at 2488 ("The fact that an arrestee has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely."). To get to that position of essentially unlimited government authority for routine border searches, the Supreme Court has put more emphasis on the other side of the Fourth Amendment balance: the government's heightened interest at the border. *See id.* at 538–40 (noting the reduced privacy interest at the border but reiterating the strong government interest). If contraband is not being electronically concealed in phones and computers, does the government still have as compelling an interest in searching those items at the border? The government argues it does because the interests in national security and fighting crime are especially weighty at the border and searches of technology can uncover evidence of border crimes. No doubt a text message or email may reveal evidence of crimes, but that is true both at and inside the border. But it is uncertain whether the evidence-gathering justification is so much stronger at the border that it supports warrantless and suspicionless searches of the phones of the millions crossing it. The Supreme Court has not focused on it in discussing the broad border-search authority, instead emphasizing the historic rationale of finding contraband.

There may a clue to resolving this dilemma in the earliest case that gets cited for the constitutionality of border searches; it also happens to be the first

14

No. 17-50070

Supreme Court case addressing any aspect of the Fourth Amendment.[6] *Boyd v. United States* draws a sharp distinction between searches for contraband and those for evidence that may reveal the importation of contraband. In finding unconstitutional a revenue law that allowed subpoenas for a customs invoice, *Boyd* observes that:

> The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. The two things differ *toto coelo*.

116 U.S. at 623. *But see Warden v. Hayden*, 387 U.S. 294, 300–01 (1967) (rejecting a Fourth Amendment distinction between "seizure of items of evidential value only and seizure of instrumentalities, fruits, or contraband").[7] In explaining why the two searches differ to the "whole extent of the heavens"

---

[6] Wayne LeFave, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 1.1(b); *see also Carroll*, 267 U.S. at 147 (calling *Boyd* "[t]he leading case on the subject of search and seizure").

[7] *Hayden* rejects the "mere evidence" rule that had long prevented the government from using warrants to obtain evidence that was not itself the instrumentality of a crime or contraband. 387 U.S. at 301–02 (citing and casting doubt on this aspect of *Gouled v. United States*, 255 U.S. 298, 309 (1921)). The idea was that the authority to seize property extended only to objects in which the subject of the search had forfeited an interest to the government because of the item's illegality. *Gouled*, 255 U.S. at 309; *see also Hayden*, 387 U.S. at 303 ("The Fourth Amendment ruling in *Gouled* was based upon the dual, related premises that historically the right to search for and seize property depended upon the assertion by the Government of a valid claim of superior interest, and that it was not enough that the purpose of the search and seizure was to obtain evidence to use in apprehending and convicting criminals."). Although *Hayden* is viewed as a broad rejection of the "mere evidence"/instrumentality distinction, *see* LeFave, *supra*, § 4.1(c), there are reasons to believe the distinction still matters when it comes to border searches. Most importantly, in a number of decisions since *Hayden* the Supreme Court has continued to chiefly rely on the detection-of-contraband rationale in supporting the government's broad border-search authority. That makes sense as seizing contraband was the power granted in the customs law passed by the First Congress that the Court has repeatedly relied on in authorizing warrantless searches of those entering the country. From a broader jurisprudential perspective, *Hayden* rejected the distinction as one based on a "discredited" property view of the Fourth Amendment, 387 U.S. at 304, *see* LeFave, *supra*, § 2.6(e), but that approach is enjoying a resurgence, *see, e.g.*, *Florida v. Jardines*, 569 U.S. 1, 5 (2013); *United States v. Jones*, 565 U.S. 400, 404–05 (2012).

in the meaning of the Latin phrase used, the *Boyd* Court noted that the seizure of goods "concealed to avoid the duties payable on them[] has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government." 116 U.S. at 623. No similar tradition exists for unlimited authority to search and seize items that might help to prove border crimes but are not themselves instrumentalities of the crime. To be sure, *Boyd* addresses a government attempt to obtain import invoices not at the border but via a subpoena during a prosecution (and the Fifth Amendment aspects of its holding are no longer good law[8]). But its emphatic distinction between the sovereign's historic interest in seizing imported contraband and its lesser interest in seizing records revealing unlawful importation has potential ramifications for the application of the border-search authority to electronic data that cannot conceal contraband and that, to a much greater degree than the papers in *Boyd*, contains information that is "like an extension of the individual's mind" and works as a "substitute for the perfect memory that humans lack." Samuel A. Alito, Jr., *Documents and the Privilege Against Self-Incrimination*, 48 U. PITT. L. REV. 27, 39 (1986) (referring to this last insight as a "kernel of truth" from *Boyd*).

The contours of the border-search doctrine in this new area—what level of suspicion, if any, is required and whether a warrant is ever required—may well turn on whether the interest at the border in general crime fighting and national security, which phone searches can further, is as weighty as the traditional justification of seizing contraband, which an electronic search is not likely to accomplish. Because the Supreme Court has not said much about this

---

[8] *See Andresen v. Maryland*, 427 U.S. 463, 471–72 (1976); *Fisher v. United States*, 425 U.S. 391, 407–08 (1976); *see also* Samuel A. Alito, Jr., *Documents and the Privilege Against Self-Incrimination*, 48 U. PITT. L. REV. 27, 43–44 (1986).

alternative justification the government cites, future developments may provide guidance. That counsels for not freezing our approach in place when we don't have to.