**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MIGUEL ANGEL CANO,
*Defendant-Appellant*.

No. 17-50151

D.C. No.
3:16-cr-01770-BTM-1

ORDER

Filed September 2, 2020

Before: Susan P. Graber and Jay S. Bybee, Circuit Judges,
and M. Douglas Harpool,[*] District Judge.

Order;
Dissent by Judge Bennett

---

[*] The Honorable M. Douglas Harpool, United States District Judge for the Western District of Missouri, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel denied a petition for rehearing and denied on behalf of the court a petition for rehearing en banc.

Judge Bennett, joined by Judges Callahan, M. Smith, R. Nelson, Bade, and VanDyke, dissented from the denial of rehearing en banc. Judge Bennett wrote that under the panel's decision, border officials in this circuit are now constitutionally barred from forensically searching a traveler's cell phone at the border, even if armed with reasonable suspicion the phone contains evidence of terrorist acts the traveler is about to commit in the United States; evidence the traveler is entering the United States under a false name; evidence of contemporaneous smuggling activity by the traveler; evidence of other border related crimes; or evidence of non-child pornography contraband.

### COUNSEL

Harini P. Raghupathi (argued), Federal Defenders of San Diego, Inc., San Diego, California, for Defendant-Appellant.

Mark R. Rehe (argued), and Peter Ko, Assistant United States Attorneys; Daniel E. Zipp, Chief, Appellate Section, Criminal Division; Robert S. Brewer Jr., United States Attorney;

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

Sophia Cope and Adam Schwartz, Electronic Frontier Foundation, San Francisco, California, for Amicus Curiae Electronic Frontier Foundation.

---

**ORDER**

The panel judges have voted to deny Plaintiff-Appellee's petition for rehearing. Judge Graber voted to deny the petition for rehearing en banc, and Judges Bybee and Harpool recommended denying the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc. A judge of the court requested a vote on en banc rehearing. The matter failed to receive a majority of votes of non-recused active judges in favor of en banc consideration. Fed. R. App. P. 35.

Plaintiff-Appellee's petition for rehearing and petition for rehearing en banc, filed January 2, 2020, are **DENIED**.

---

BENNETT, Circuit Judge, with whom CALLAHAN, M. SMITH, R. NELSON, BADE and VANDYKE, Circuit Judges, join, dissenting from the denial of rehearing en banc:

In 2016, Defendant Miguel Cano entered the United States from Mexico, and a routine search of his truck turned up 31 pounds of cocaine hidden in his spare tire. As the panel correctly noted, border officials "had reason to suspect that

Cano's [cell] phone would contain evidence leading to additional drugs." *United States v. Cano*, 934 F.3d 1002, 1021 (9th Cir. 2019).[1] And so, those border officials—objectively relying on decisions from the Supreme Court and a recent en banc decision from our court—searched the phone. Unsurprisingly they found more evidence of Cano's guilt. Despite an unbroken line of cases authorizing the border search here, the panel reversed Cano's convictions because in their view, reasonable suspicion of criminal activity cannot justify a forensic search of Cano's phone. Instead, the panel held that absent a warrant, border officials, with reasonable suspicion or probable cause of other criminal activity, could only forensically search a cell phone to see if it contained contraband. And since effectively the only contraband a cell phone can contain is child pornography,[2] the only permissible forensic search at the border is one *for* child pornography. Even then, only if agents have reasonable suspicion the phone contains child pornography. The government has referred to the panel's decision as an "outlier."[3] It is that, but far more. The Supreme Court has told us that a border search is reasonable simply because it takes place at the border. The Court has also instructed that the sovereign's power at the border is at its "zenith." The limits the panel placed on border searches ignores the Court's

---

[1] The district court had found that "[t]his not only amounts to reasonable suspicion, but gives rise to probable cause." *United States v. Cano*, 222 F. Supp. 3d 876, 882 (S.D. Cal. 2016) *rev'd,* 934 F.3d 1002 (9th Cir. 2019).

[2] *Cano*, 934 F.3d at 1021.

[3] Brief for the United States in Opposition at 27, *Williams v. United States*, No. 19-1221 (U.S. June 19, 2020).

teachings and, as a result, makes our borders far more porous and far less safe.

Border officials in our circuit are now *constitutionally barred* from forensically searching a traveler's cell phone at the border, even if armed with reasonable suspicion the phone contains evidence of terrorist acts the traveler is about to commit in the United States; evidence the traveler is entering the United States under a false name; evidence of contemporaneous smuggling activity by the traveler; evidence of other border related crimes; or evidence of non-child pornography contraband.[4] This is the sovereign power at its nadir, not its zenith.

We should have taken this case en banc to correct the panel's errors, and I respectfully dissent from our failure to do so.

---

[4] The opinion quotes language from *Carroll v. United States*, 267 U.S. 132 (1925) describing the government's interest in controlling who may enter the country. *See United States v. Cano*, 934 F.3d 1002, 1013 (9th Cir. 2019). But the *holding* of *Cano* leaves no room for this interest—"the border search exception authorizes warrantless searches of a cell phone *only* to determine whether the phone contains contraband." 934 F.3d at 1018 (emphasis added). Nor does the opinion mention the government's national security interest at the border. *See, e.g.*, *United States v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018) (concluding that some transnational offenses implicating national security interests "go[] to the heart of the border search exception"); *United States v. Boumelhem*, 339 F.3d 414, 423 (6th Cir. 2003) (noting that the sovereign interest to protect itself includes "significant government interests in the realms of national security and relations with other nations"); *see also Tabbaa v. Chertoff*, 509 F.3d 89, 97 (2d Cir. 2007) (recognizing that a "crucial" aspect of Customs and Border Protection's authority "is to 'prevent terrorist attacks within the United States' and 'reduce the vulnerability of the United States to terrorism.'" (quoting 6 U.S.C. § 111(b)(1)).

## I.

On July 25, 2016, Miguel Cano entered the United States from Tijuana for the seventh time that summer.[5] *Cano*, 934 F.3d at 1008. During a secondary inspection, a narcotics dog alerted near the spare tire of Cano's truck. *Id.* A Customs and Border Protection (CBP) officer discovered about 31 pounds of cocaine in 14 vacuum-sealed packages inside the spare tire. *Id.*

CBP officers arrested Cano and seized his cell phone. *Id.* They then called Homeland Security Investigations, which dispatched two agents to investigate. *Id.* The agents manually searched Cano's phone and questioned Cano after he waived his *Miranda* rights. *Id.* Cano told them that he moved to Tijuana to look for work in San Diego because work was slow in Los Angeles, and he was going to a carpet store in Chula Vista to seek work. *Id.* He also explained that he deleted his text messages before crossing the border on his cousin's advice "just in case" he was pulled over by Mexican police. *Id.* One of the agents conducted a second manual search of the phone during the interview, wrote down some of the phone numbers in the phone's call log, noted that two new text messages had arrived after Cano crossed the border, and took a picture of those messages. *Id.* The agent then used Cellebrite software to download data from the phone.[6] Agents

---

[5] He had crossed the border six times that summer, sometimes staying less than thirty minutes in the United States. *Cano*, 934 F.3d at 1008. He was twice referred to secondary inspection, but no contraband was found. *Id.*

[6] A Cellebrite "logical download" allows the government "access [to] text messages, contacts, call logs, media, and application data on a cell phone and to select which types of data to download." *Id.* at 1008–09. But

reviewed the download after the interview and saw a list of Cano's calls. *Id.* at 1009. None of the numbers Cano called "corresponded to carpeting stores in San Diego." *Id.*

Cano was indicted for importing cocaine and moved to suppress the evidence obtained from the warrantless searches of his phone at the border. *Id.* The district court denied the motion, finding the manual search was "clearly permissible" and "the agents had reasonable suspicion and even probable cause" to perform the "logical download." *Cano*, 222 F. Supp. 3d at 882. The government introduced, and relied on, evidence obtained from the phone at trial. Cano in turn presented a third-party culpability defense, claiming that his cousin placed the drugs in Cano's spare tire without Cano's knowledge. *Cano*, 934 F.3d at 1009. The jury was hung after the first trial and convicted Cano at the second. *Id.* at 1010.

A panel of this court reversed because "the district court erred in denying Cano's motion to suppress." *Id.* at 1010. The panel agreed with Cano that the warrantless searches of his phone at the border violated the Fourth Amendment because "border searches are limited in both purpose and scope to searches for contraband." *Id.* at 1016–17. The panel drew a "distinction between seizing goods at the border because their importation is prohibited and seizing goods at the border because they may be useful in prosecuting crimes." *Id.* at 1018. From this, the panel imposed "two practical limitations on warrantless border searches." *Id.* at 1019. First, border officials can search for only contraband (rather than evidence of contraband-related crimes) because otherwise the search is "untethered" from the exception. *Id.* Second, border officials

the software does not allow access to data stored within third-party applications. *Id.* at 1009.

need reasonable suspicion of digital contraband (like child pornography) concealed within a cell phone to forensically search a cell phone. *Id.* at 1020. Otherwise, the panel opined, the government could forensically search "every electronic device of anyone arrested at the border" and this would go against "the protections laid out in *Riley*"[7] simply because the search occurred at the border. *Id.*

Applying this new view of the border search exception to the facts of the case, the panel found that the second manual search of the phone was outside the scope of the border search exception irrespective of the reasonable suspicion of border-related crimes. *Id.* at 1019. The agent could not record the phone numbers or photograph the two messages received because "[t]hose actions have no connection whatsoever to digital contraband." *Id.* Thus, the second manual search was unreasonable. And the panel held if the use of the Cellebrite software to download some of the phone's contents was a forensic search, it was unreasonable because agents had no reasonable suspicion that there was contraband on the phone. *Id.* at 1020. The panel also concluded that once a person has been arrested "there is no reason why border officials cannot obtain a warrant before conducting their forensic search" because new technology allows for faster processing of warrant applications. *Id.*

---

[7] In *Riley v. California*, 573 U.S. 373 (2014), the Court held "a warrant is generally required before . . . a search [for information on a cell phone], even when a cell phone is seized incident to arrest." *Id.* at 401. The Court limited this holding only to the search incident to arrest exception. *Id.* at 385 ("These cases require us to decide how the search incident to arrest doctrine applies to modern cell phones . . . ."); *id.* at 401–02 ("[E]ven though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone.").

Finally, the panel found the good faith exception did not apply because under the panel's new interpretation of *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (en banc) —that *Cotterman* authorized only a search for contraband, not evidence—the CBP agents could not have relied in good faith on *Cotterman* to search for evidence of border-related crimes. *Id.* at 1021–22.

## II.

The panel decision runs headlong into decades of Supreme Court precedent and deviates from the historical understanding of the purpose of the border search exception. The panel's framework also goes against the clear statement of the law in *Cotterman* and has been soundly rejected by at least two other circuits.

## A.

The border search exception is "as old as the Fourth Amendment itself" and "is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *United States v. Ramsey*, 431 U.S. 606, 619, 620 (1977). In *Ramsey*, the Court emphasized that a border search is reasonable by one "single fact": did the "person or item in question . . .enter[] into our country from outside[?]" *Id.* at 619. Nothing in the opinion purported to limit the power of the sovereign at the border to search only for contraband, and the Court expressly reserved the question of whether the search was authorized under the statute at issue or whether that statute imposed a limit "on otherwise existing authority of the Executive." *Id.* at 615. Put differently, *Ramsey* did not decide whether border searches need to be authorized by

statute or are per se valid exercises of Executive power. The Court in *Ramsey* chided the D.C. Circuit for characterizing the Court's prior decisions as a refusal "to take an expansive view of the border search exception or the authority of the Border Patrol." *Id.* at 622. The Court instead noted that the border search authority is "plenary." *Id.*

The Court revisited the border search exception in *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985), reversing a decision of our court. The case focused on an alimentary canal search of a cocaine "balloon-smuggler," and once again emphasized the government's "plenary authority to conduct routine searches and seizures at the border" because searches "at the national border rest on different considerations and different rules of constitutional law from domestic regulations." *Id.* at 537 (citation omitted). The Court again was clear:

> Here the seizure of respondent took place at the international border. Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.

*Id.* Balancing the "sovereign's interests at the border [against] the Fourth Amendment rights of [the] respondent" the Court held that reasonable suspicion is necessary for searches "beyond the scope of a routine customs search and

inspection." **⁸** *Id.* at 539–41. The Court also cautioned judges to "not indulge in unrealistic-second guessing" or engage in *post hoc* evaluation of agents' behavior when discussing whether a particular detention was reasonably related in scope to the circumstances. *Id.* at 542. The Court lastly took us to task for establishing an intermediate standard between "reasonable suspicion" and "probable cause"—that of a "clear indication." *Id.* at 540–41.

The final time the Court addressed the border search exception was in *United States v. Flores-Montano*, 541 U.S. 149 (2004), after our court held that agents needed reasonable suspicion to remove a gas tank at the border. *Id.* at 151. The Court once again emphasized that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border" because "[i]t is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *Id.* at 152–53. The Court also noted that "the expectation of privacy is less at the border than it is in the interior." *Id.* at 154. Applying these principles, the Court reversed our decision. *Id.* at 156.

Thus, the Court has never questioned the scope of the border search exception and "[t]ime and again," confirmed the broad authority of the sovereign at the border.**⁹** *Id.* at 152.

---

**⁸** The Court did not define what types of searches were beyond the scope of a *routine* customs search other than "strip, body cavity, or involuntary x-ray searches." *Montoya de Hernandez*, 473 U.S. at 541 n.4.

**⁹** This also tracks the English common law understanding of the traditional search powers of the sovereign. During the 1600s, for example, "[m]ost Englishmen . . . understood their houses to be castles only against their fellow subjects and conceded almost absolute powers of search,

## B.

Our circuit has imposed another limitation on the sovereign at the border. In *Cotterman*, we held that border officials needed reasonable suspicion to forensically search electronic devices at the border. *See United States v. Cotterman*, 709 F.3d at 970. While in tension with the Court's admonition that a border search is "reasonable" by virtue of being at the border, *see Ramsey*, 431 U.S. at 619, our court imposed this "modest, workable standard" because it analogized intrusive forensic searches to "computer strip search[es]" given "the uniquely sensitive nature of data on

---

arrest, and confiscation to the government." William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning 1602–1791, Ixiii (2009). Similarly, the sovereign search power at common law extended beyond enforcement of excise taxes and contraband. *Id.* at 89 (noting that the Privy Council directed customs personnel and other officials to search for "military deserters returning from France" in 1592). It was not until the mid-1700s that the view that a "man's home is his castle" expanded to bar certain searches by the Crown. *Id.* at Ixiv. But while this change was occurring and the sovereign's powers to search the *home* became restricted by law, there was no accompanying shift in the view of the power at the border in England, *id.* at 325 ("[F]or affairs on which the perceived survival of the realm hinged . . . only the general warrant existed, and the specific warrant was not even a candidate."), or in the Colonies, *id.* (noting that the primary focus was on searches of the home and "ship searches" for example were not discussed or debated "even during the decade in which the Fourth Amendment was framed, debated, and ratified"); *see also id.* at 745 (noting the requirement for a warrant "stopped at the waterline" in the Colonies). There is no historical precedent that the sovereign's power at the border was in any way limited at the founding. *Cf. Riley*, 573 U.S. at 403 ("Our cases have recognized that the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through *homes* in an unrestrained search for evidence of criminal activity." (emphasis added)).

electronic devices." *Cotterman*, 709 F.3d at 966. But we plainly stated that officials must "possess a particularized and objective basis for suspecting the person stopped of *criminal activity*" to forensically search a laptop at the border. *Id.* at 967 (quotation marks omitted and emphasis added). In fact, we could not have been clearer in explaining the reasonable suspicion standard as we used "criminal activity" thirteen times when discussing the appropriate focus of the standard. Not once did we say reasonable suspicion of *contraband*.

In articulating why reasonable suspicion is a workable standard at the border, we explained that border officials would conduct forensic searches when "their suspicions are aroused by what they find or by other factors" and the reasonable suspicion standard "leaves ample room for agents to draw on their expertise and experience to pick up on subtle cues that *criminal activity* may be afoot." *Id.* (emphasis added). This statement is unambiguous. Then, when discussing the relevant factors agents must consider in the totality of the circumstances analysis, we explained that encryption or password protection of data on a device does not alone create reasonable suspicion. *Id.* at 969. Rather, the encryption or password protection must relate "to the suspected criminal activity." *Id.* We also differentiated between the different types of criminal activity agents could reasonably suspect to justify a forensic search. *Id.* at 970 ("Nor did the agents' discovery of vacation photos eliminate the suspicion that Cotterman had engaged in criminal activity while abroad *or* might be importing child pornography into the country." (emphasis added)). Before this decision, courts across the country uniformly applied *Cotterman* to determine whether border officials had reasonable suspicion of criminal activity, not just contraband, to justify forensic searches of

electronic devices at the border.[10] The panel's "clarification" goes against the text and analysis in *Cotterman*.[11]

## C.

The panel's view has also already been rejected by the Fourth and Tenth Circuits, with others likely to follow. The panel acknowledged that its "analysis is in tension with the Fourth Circuit[]." *Cano*, 934 F.3d at 1017 (citing *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018)). Just after *Cano* was decided, the Tenth Circuit deepened that split. *See United States v. Williams*, 942 F.3d 1191 (10th Cir. 2019) *petition for cert. filed*, (U.S. Apr. 13, 2020) (No. 19-1221).

In *Kolsuz*, the Fourth Circuit upheld the forensic search of a cell phone after the defendant was arrested for violating

---

[10] No other court has interpreted *Cotterman*'s reasonable suspicion test to apply only to contraband. *See, e.g.*, *United States v. Hassanshahi*, 75 F. Supp. 3d 101 (D.D.C. 2014) (forensic laptop search was supported by reasonable suspicion that defendant was violating the Iran trade embargo); *United States v. Saboonchi*, 990 F. Supp. 2d 536 (D. Md. 2014) (forensic search of electronic devices including a cell phone was supported by reasonable suspicion defendant was engaged in export control violations); *United States v. Kim*, 103 F. Supp. 3d 32 (D.D.C. 2015). In *Kim* in particular, the court found that the *Cotterman* standard would have been satisfied if the officer "would have been justified in his belief that [defendant] was engaged in ongoing *criminal activity* at the time he was stopped." 103 F. Supp. 3d at 44.

[11] This clarification also runs into another problem. We have already relied on *Cotterman*'s reasonable suspicion test in another decision unrelated to the border search exception. *See United States v. Valdes-Vega*, 738 F.3d 1074 (9th Cir. 2013) (en banc). The panel's narrow view of *Cotterman*'s legal test is difficult to square with our citing *Cotterman* for the broad rule that reasonable suspicion requires some suspicion of *criminal activity*. *Id.* at 1078.

export laws. 890 F.3d at 136–37. The court reasoned "[t]he justification behind the border search exception is broad enough to accommodate not only the direct interception of contraband as it crosses the border, but also prevention and disruption of ongoing efforts to export contraband illegally, through searches initiated at the border."[12] *Id.* at 143–44. Kolsuz had unsuccessfully argued that the scope of the border search exception was untethered from the search of his phone because "there was no contraband poised to exit the country" once he was arrested. *Id.* at 142–43.

Similarly, after *Cano* was decided, the Tenth Circuit found that reasonable suspicion of criminal activity justified a warrantless search of a laptop and cell phone. *See Williams*, 942 F.3d at 1190–91. A search of the laptop using a software program to bypass the passwords revealed child pornography after defendant's passport triggered a secondary inspection based on "lookout alerts." *Id.* at 1188–90. The Tenth Circuit found reasonable suspicion existed based on defendant's border-related criminal history, his untruthful answers about his travel history, and that he was returning on a one-way ticket from Paris, the site of a recent terrorist attack, after visiting the three countries linked to the attack. *Id.* at 1190–91. The court also rejected the defendant's argument that "border agents are tasked exclusively with upholding customs laws and rooting out the importation of contraband," and thus rejected the argument that because the agents did not

---

[12] In *United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019), the Fourth Circuit clarified that the border search exception must have a "transnational" nexus under *Kolsuz*. The criminal activity must have a nexus "to the sovereign interests underlying the border search exception." *Id.* at 724. That nexus, is, of course, present in our case, where Cano imported 31 pounds of cocaine.

suspect him of these crimes the agents could not search his electronic devices. *Id.* at 1191. The court explained that "the Fourth Amendment does not require law enforcement officers to close their eyes to suspicious circumstances." *Id.* (brackets and citation omitted).

The Eleventh Circuit is sure to follow. In *United States v. Touset*, 890 F.3d 1227, 1234 (11th Cir. 2018), the court already rejected *Cotterman* and found no reasonable suspicion is necessary for forensic searches of electronic devices at the border. The court also found that *Riley*, a case *Cano* relies on extensively to narrow the scope of the border search exception, 934 F.3d at 1011, 1020, has no application at the border. 890 F.3d at 1234; *see also United States v. Vergara*, 884 F.3d 1309, 1312–13 (11th Cir. 2018). In combination, these two cases firmly reject the panel's narrow view.

Nor will these be the last circuits to disagree with us. The Seventh and Fifth Circuits have already applied broader definitions of reasonable suspicion when considering forensic warrantless cell phone searches at the border under the good faith exception. *See United States v. Wanjiku*, 919 F.3d 472, 485–88 (7th Cir. 2019) (finding agents had the good faith belief that searches of defendant's electronic devices only required reasonable suspicion and agents did have reasonable suspicion that the devices would "reveal *evidence* of criminal activity involving minors" (emphasis added)); *United States v. Molina-Isidoro*, 884 F.3d 287, 291–92 (5th Cir. 2018) (finding agents had probable cause to search defendant's phone at the border because there was a high probability she "was engaged in drug trafficking" and thus had a good faith belief that their search was lawful).

## III.

This should have been a simple case. As the district court recognized, under *Cotterman* the government agents had more than reasonable suspicion of criminal activity to search Cano's phone. *Cano*, 222 F. Supp. 3d at 882. Cano was found with 31 pounds of cocaine in his truck's spare tire. *Cano*, 934 F.3d at 1008. The agents had, at minimum, reasonable suspicion more drugs might be coming across the border, which the Court has specifically recognized heightens the sovereign's concern "for the protection of the integrity of the border." *Montoya de Hernandez*, 473 U.S. at 538. These are not the facts on which to effectively eliminate an exception "as old as the Fourth Amendment itself." *Ramsey*, 431 U.S. at 619.

First, the sweeping language used by the Court in each of its border search decisions cuts against narrowing the scope or purpose of the border search exception. In only one instance has the Court limited the border search doctrine, and it did not narrow the scope but only increased the level of suspicion necessary for a particularly intrusive type of search of the person. *See Flores-Montano*, 541 U.S. at 152–53. The Court has already twice reversed us for trying to impose greater limits on the border search exception, *see id.*; *Montoya de Hernandez*, 473 U.S. at 540–41, and has cautioned us against creating new exceptions, *Flores-Montano*, 541 U.S. at 152 ("Complex balancing tests to determine what is a 'routine' search of a vehicle, as opposed to a more 'intrusive' search of a person, have no place in the border searches of vehicles.").

Second, the panel inexplicably limits the government's interest at the border to only stopping contraband.[13] The panel contends that "'every border-search case the Supreme Court has decided involved searches to locate *items being smuggled*' rather than evidence." *Cano*, 934 F.3d at 1018 (quoting *Molina-Isidoro*, 884 F.3d at 295 (Costa, J., specially concurring)).[14] True, but this limited view reads the sovereign's interest far too narrowly. *See United States v. Oriakhi*¸ 57 F.3d 1290, 1297 (4th Cir. 1995) ("While it is undoubtedly true that border searches are more often conducted in furtherance of the sovereign's interest in excluding" people and goods at the border, "that interest in *exclusion* is not the only function of the border search.").

The Court has explicitly stated that the exception is rooted in "the long-standing right of the sovereign to protect itself," *Ramsey*, 431 U.S. at 616, and "the Government's paramount interest in protecting the border," *Flores-Montano*, 541 U.S. at 155. Statutory language and other circuit decisions reaffirm the expansive reading that the inherent power of the sovereign to protect itself, or the border, is not limited to searching for contraband like child pornography. *See, e.g.*,

---

[13] And even under the panel's cramped view of the border search exception, it is hard to see how the *plenary* authority "to prevent the introduction of contraband into this country," *Montoya de Hernandez*, 473 U.S. at 537, does not include within it the ability to prevent the *future* introduction of contraband. The expansive view the Court has accorded the Congress and the Executive in this realm should guide our analysis.

[14] The panel's view reads a lot like the dissent in *Montoya de Hernandez*. *See* 473 U.S. at 554 (Brennan, J., dissenting) (arguing that there is a difference at the border between Congress's immigration and customs authority and "searches [that] are carried out *for purposes of investigating suspected criminal activity*").

6 U.S.C. § 211(e)(3) (the duties of the border patrol agents includes duty to prevent not only contraband but also entry of terrorists and terrorist weapons); 8 U.S.C. § 1357(c) (immigration officials can "without warrant . . . [search] the personal effects . . . of any person seeking admission to the United States" based on "reasonable cause to suspect that grounds exist for denial of admission to the United States . . . which would be disclosed by such search"); 31 U.S.C. § 5317(b) (power to seize undeclared currency flowing through the border); *Kolsuz*, 890 F.3d at 143 (transnational offenses involving export controls and national security interests "go[] to the heart of the border search exception"); *Molina-Isidoro*, 884 F.3d at 297 (Costa, J., specially concurring) (acknowledging contours of border-search doctrine for phone searches should include government interests in national security); *see also United States v. Boumelhem*, 339 F.3d 414, 423 (6th Cir. 2003) (sovereign interest to protect itself includes "significant government interests in the realms of national security and relations with other nations").

Third, "[t]he distinction that [the panel] would draw between contraband and documentary evidence of a crime is without legal basis." *United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006) (citing *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 301 (1967)) (rejecting this specific distinction in the context of a border search). In *Hayden*, the Supreme Court rejected the distinction between evidence and contraband created by *Boyd v. United States*, 116 U.S. 616 (1886). 397 U.S. at 300–02. The Court explained that it has "examined on many occasions the history and purposes of the [Fourth] Amendment" and explained that "[n]othing in the language of the Fourth Amendment supports the distinction between 'mere evidence' and instrumentalities, fruits of

crime, or contraband." *Hayden*, 387 U.S. at 301–02. This broad pronouncement leaves little room for the panel's position that *Boyd* militates a distinction between a search for evidence and a search for contraband. *See Cano*, 934 F.3d at 1018.

The panel's decision also makes little constitutional sense when filtered through the Fourth Amendment lens of reasonableness.[15] *See Riley*, 573 U.S. at 381–82 ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006))). Why should border agents, with no reasonable suspicion of anything, be able to manually look for child pornography on a phone, but not evidence of: (1) intent to commit terrorist acts, (2) inadmissibility of the traveler to the United States, (3) other crimes, or even (4) evidence of other contraband? And why should border agents with reasonable suspicion that child pornography is on a phone be able to forensically examine the phone, but be constitutionally barred from forensically examining a phone when they have reasonable suspicion that evidence of serious border crimes—including those involving terrorism or false identity documents—is on the phone? If such distinctions make no sense, then they cannot possibly be reasonable.

---

[15] The panel also engaged the type of "unrealistic second-guessing" the Court prohibited in *Montoya de Hernandez*, 473 U.S. at 542, when it concluded "there is no reason why border officials cannot obtain a warrant before conducting their forensic search" because the time to get a warrant is "trivial" when compared to the time necessary for a forensic search. *Cano*, 934 F.3d at 1020. "[T]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, in itself, render the search unreasonable." *Montoya de Hernandez*, 473 U.S. at 542 (citation omitted).

And finally, judicial restraint is especially important here, "where there is a longstanding historical practice . . . of deferring to the legislative and executive branches." *Kolsuz*, 890 F.3d at 153 (Wilkinson, J., concurring). One difficulty with judicial decisions like the panel's is they provide no flexibility. Given the origin of the exception, surely the current Congress should have some say in the current officials' ability to prevent future attempts to weaken the border, "the point most freighted with security threats and the point at which a nation asserts and affirms its very right to nationhood." *Id.* at 152. Instead, we rule in a vacuum in an area where technological advances rapidly outpace our best guesses and intuitions and "[w]e have no idea of the dangers we are courting." *Id.* at 150.

Ultimately, the panel's decision to limit the border search exception to searches for contraband finds "no support . . . in the Supreme Court's border-search cases . . . [and] ignores the Court's admonitions to interpret the doctrine broadly and avoid creating new limitations." *United States v. Aigbekaen*, 943 F.3d 713, 730 (4th Cir. 2019) (Richardson, J., concurring in judgment) (challenging the majority for imposing even a transnational nexus requirement on criminal activity for border searches). It is the decision—and not the search of Cano's phone—that is unreasonable.

## IV.

The panel made a final error by finding the cell phone evidence obtained by the agents was not covered by the good faith exception. The panel rejected the government's reliance on *Cotterman* because the panel re-interpreted *Cotterman* as a "search for *contraband* that the government has a right to seize at the border." *Cano*, 934 F.3d at 1021–22. The panel

applied its view of the case *retroactively*. That is not how the good faith exception works.

The exclusionary rule does not apply to "[e]vidence obtained during a search conducted in reasonable reliance on binding [appellate] precedent." *United States v. Davis*, 564 U.S. 229, 241 (2011). The inquiry in *Davis* "is not answered simply by mechanically comparing the facts of cases and tallying their similarities and differences." *United States v. Lustig*, 830 F.3d 1075, 1081 (9th Cir. 2016) (quoting *United States v. Katzin*, 769 F.3d 163, 176 (3d Cir. 2014) (en banc)). Thus, in *Lustig*, we held that "it was objectively reasonable" for the government to rely on *United States v. Robinson*, 414 U.S. 218 (1973), as binding precedent authorizing the warrantless search of a cell phone incident to arrest prior to *Riley*. 830 F.3d at 1080. *Robinson* announced a categorial rule, based on a search of a cigarette package, decades before the invention of the modern cell phone. 414 U.S. at 223. More importantly, we "reject[ed] Lustig's contention that the good-faith exception cannot apply here because, at the time of his arrest, there had not been any decision by this Circuit or the Supreme Court directly authorizing warrantless cell phone searches incident to arrest." *Lustig*, 830 F.3d at 1082. Holding otherwise, "would make the good-faith exception a nullity because the exception would only apply when the search was necessarily constitutional under existing precedent." *Id.*

Similarly, the panel erred by applying its own view of *Cotterman* as the appropriate comparison when no court had ever so held, and the agents' (and the district court's) view was, at the very least, reasonable. I fail to see how CBP agents cannot rely on the "longstanding and expansive authority of the government to search persons and their

effects at the border," *Molina-Isidoro*, 884 F.3d at 290, on top of our decision in *Cotterman*, which announced a categorical rule that forensic examinations of computers "required a showing of reasonable suspicion," 709 F.3d at 968. At the time of the search, no court, much less the Supreme Court or other appellate court, had held that a search of a cell phone with reasonable suspicion of criminal activity was outside the scope of the border search exception. As Judge Costa concluded *on nearly identical facts* (as to the evidence obtained through the manual search), "the existence of good faith [here] is not a close call." *Molina-Isidoro*, 884 F.3d at 293 (Costa, J., specially concurring).

The exclusionary rule "exacts a heavy toll on both the judicial system and society at large" because "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Davis*, 564 U.S. at 237. For the cost to be acceptable, "the deterrence benefits of suppression must outweigh its heavy costs." *Id.* When law enforcement officers "act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* (quotation marks and citations omitted). Requiring law enforcement officers to be Nostradamus, as the panel did here, improperly turns the good faith exception on its head, and requires the "court[] to ignore reliable, trustworthy evidence"—a "bitter pill" to swallow with no deterrence benefit. *Id.* at 237.

## V.

The panel's decision contradicts the history of the border search exception and the Supreme Court's teachings as to the almost plenary nature of the sovereign's authority at the

border. The decision also makes a judgment untethered from any Fourth Amendment reasonableness calculus—drawing an unprecedented at-the-border distinction between reasonable suspicion of border-related crimes in general (not enough) and reasonable suspicion of the presence of contraband (enough). This is the exact type of distinction (if it is to be drawn) that must be left to the political branches. And finally, the decision rewrites the good faith exception, penalizing border officers for incorrectly divining future courts' views on presently clear binding appellate precedent. For these reasons, I respectfully dissent from the denial of rehearing en banc.